No. 12-2056

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

_____

TUSSEY et. al.,

Plaintiffs-Appellees,

v.

ABB, Inc. et. al.,

Defendants-Appellants.

_____

On Appeal from the United States District Court
for the Western District of Missouri

_____

BRIEF FOR THE SECRETARY OF LABOR AS AMICUS CURIAE
SUPPORTING PLAINTIFFS-APPELLEES

_____

M. PATRICIA SMITH
Solicitor of Labor

NATHANIEL I. SPILLER
Counsel for Appellate and
Special Litigation

TIMOTHY D. HAUSER
Associate Solicitor for
Plan Benefits Security

DAVID ELLIS
Trial Attorney
U.S. Department of Labor
200 Constitution Ave., N.W.,
Room N-4611
Washington, D.C. 20210
(202) 693-5688

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... ii

QUESTIONS PRESENTED ...........................................................................1

THE SECRETARY'S INTEREST ....................................................................1

STATEMENT OF THE FACTS ......................................................................2

    A. ABB's Defined Contribution Plans ..........................................................2

        1.    Revenue Sharing .......................................................................3

        2.    Fidelity's Provision Of Corporate Benefits Outsourcing To ABB................................................................................................4

        3.    ABB's Replacement Of The Vanguard Wellington Fund With The Fidelity Freedom Funds ...................................................5

    B.    The District Court's Decision................................................................5

SUMMARY OF ARGUMENT ...................................................................10

ARGUMENT ..............................................................................................12

    I.    The District Court Correctly Concluded that Defendants Acted Imprudently and Disloyally With Regard to Recordkeeping Fees ......12

    II.    The ABB Fiduciaries Substituted The Fidelity Freedom Funds For The Vanguard Wellington Fund Within The Statutory Limitations Period................................................................................................22

    III.    The District Court Properly Concluded That The IPS Was A Plan Document That Defendants Improperly Failed To Follow.................25

CONCLUSION ..........................................................................................30

CERTIFICATE OF COMPLIANCE
CERTIFICATE OF SERVICE

Appellate Case: 12-2056    Page: 2    Date Filed: 06/18/2013    Entry ID: 4046306

# TABLE OF AUTHORITIES

**Federal Cases**:

Alder v. B.C. Ziegler & Co., 01-C-1119,
  2006 WL 2380631 (E.D. Wis. Aug. 16, 2006)..................................28

Bose Corp. v. Consumers Union of U.S., Inc.,
  466 U.S. 485 (1984) .......................................................................20

Braden v. Wal-Mart Stores, Inc.,
  588 F.3d 585 (8th Cir. 2009)................................................... passim

California Ironworkers Field Pension Trust v. Loomis Sayles & Co.,
  259 F.3d 1036 (9th Cir. 2001)..........................................................28

Cigna Corp. v. Amara,
  131 S. Ct. 1866 (2011) ....................................................................29

David v. Alphin,
  704 F.3d 327 (4th Cir. 2013)...........................................................24

Delaware State College  v. Ricks,
  449 U.S. 250 (1980) .......................................................................25

Donovan v. Mazzola,
  716 F.2d 1226 (9th Cir. 1983)..........................................................16

Hecker v. Deere & Co.,
  556 F.3d 575 (7th Cir. 2009), rehr'g denied,
  569 F.3d 708 (7th Cir. 2009 ..................................................... 20, 21

Howard v. Shay,
  100 F.3d 1484 (9th Cir. 1996)..........................................................18

Hughes Aircraft co. v. Jacobson,
  525 U.S. 432 (1999) .......................................................................26

Katsaros v. Cody,
  744 F.2d 270 (2d Cir. 1984)............................................................14

Appellate Case: 12-2056    Page: 3    Date Filed: 06/18/2013 Entry ID: 4046306

**Federal Cases--(continued**):

Leigh v. Engle,
 727 F.2d 113 (7th Cir. 1984)..............................................................19

Lockheed Co. v. Spink,
 517 U.S. 882 (1996)...........................................................................26

Phelps v. Qwest Employees Ben. Comm, CIV. 04CV02042LTBOES,
 2005 WL 3280239 (D. Colo. Dec. 2, 2005)........................................28

Renfro v. Unisys Corp.,
 671 F.3d 314 (3d Cir. 2011)...................................................... 20, 21

Roth v. Sawyer-Cleator Lumber Co.,
 16 F.3d 915 (8th Cir. 1994)...............................................................14

Schaefer v. Ark. Med. Soc'y,
 853 F.2d 1487 (8th Cir. 1988)...........................................................13

Secretary of Labor v. Fitzsimmons,
 805 F.2d 682 (7th Cir. 1986) (en banc)...............................................1

Tibble v. Edison Int'l,
 711 F.3d 1061 (9th Cir. 2013).............................................. 13, 16, 26

Tussey v. ABB, Inc., No. 2:06-CV,04305-NKL,
 2012 WL 1113291 (W.D. Mo. Mar. 31, 2012)....................... passim

**Statutes:**

Employee Retirement Income Security Act of 1974,
 as amended, 29 U.S.C. 1001 et seq:

 Section 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D) ............................10

 Section 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C)...............................9

 Section 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D) ............................9

Appellate Case: 12-2056 Page: 4 Date Filed: 06/18/2013 Entry ID: 4046306

**Statutes--(continued):**

Section 408(b)(2), 29 U.S.C. § 1108(b)(2) ......................................................13

Section 413, 29 U.S.C. § 1113 ............................................................. 10, 24, 26

Section 502(a)(1)(B),  U.S.C. § 1132(a)(1)(B) ..............................................29

Section 502(a)(1)(D), 29 U.S.C. § 1132(a)(1)(D) ...........................................29

**Regulations:**

29 C.F.R. § 2509.94-2 (1994) ...................................................................9

29 C.F.R. § 2550.408b-2(c)(1) ................................................................12

29 C.F.R.§ 2550.404a-5(d)(1)(iv) ...........................................................13

**Miscellaneous:**

Fed. R. Civ. P. 52(a) ........................................................................ 15, 20

EBSA, A Look at 401(k) Plan Fees (Oct. 2010), available at,
http://www.dol.gov/ebsa/publications/401k_employee.html. .................. 15, 20

Appellate Case: 12-2056   Page: 5   Date Filed: 06/18/2013 Entry ID: 4046306

# QUESTIONS PRESENTED

This brief addresses the following issues:

1. Whether the district court correctly decided that the ABB Defendants were imprudent and disloyal with respect to the payment of recordkeeping fees.

2. Whether the replacement on the Plans' platform of investment options of the Vanguard Wellington Fund with the Fidelity Freedom Funds occurred outside the statutory limitations period.

3. Whether the Investment Policy Statement is a governing plan document that the Plan's investment fiduciaries were obligated to follow unless doing so would violate ERISA.

# THE SECRETARY'S INTEREST

This appeal presents important ERISA issues concerning fiduciaries' responsibilities to evaluate revenue sharing arrangements and to avoid overpaying for plan-related services. As the head of the federal agency with primary responsibility for Title I of ERISA, Secretary of Labor v. Fitzsimmons, 805 F.2d 682, 692-93 (7th Cir. 1986) (en banc), the Secretary of Labor has a strong interest in ensuring that plan fiduciaries set plan expenses prudently and never subordinate the plan's financial interests to those of the plan sponsor. Likewise, the Secretary has a strong interest in ensuring that participants are not barred from bringing viable claims by the improper application of ERISA's statute of limitations, and in

1

having fiduciaries abide by an Investment Policy Statement formally adopted by the plan fiduciary in charge of managing plan investments, so long as doing so is consistent with the requirements of ERISA.

## STATEMENT OF FACTS

### A.     ABB's Defined Contribution Retirement Plans

ABB, Inc. offered two defined contribution retirement plans to its general employees, one for its union employees and one for its non-union employees (collectively, the "Plans").  For defined contribution plans, the amount of pension benefits depends on how an investment performs net of expenses.  The Plans generally invested in mutual funds, including mutual funds offered by Fidelity. Tussey v. ABB, Inc., 2012 WL 1113291, at *1 (W.D. Mo. Mar. 31, 2012). Fidelity Management Trust Company ("Fidelity Trust"), a subsidiary of FMR LLC (Fidelity Investments), became recordkeeper for the Plans in 1995.  Id. at *8-9. [1] As of 2000, the Plans held over $1.4 billion in assets.  Id. at *10.  ABB's Pension Review Committee established rules for the selection and monitoring of

---

[1] The ABB defendants are ABB. Inc., the Pension Review Committee of ABB, Inc. (responsible for selecting and monitoring the Plan's investment options), John W. Cutler, Jr. (director of the Pension & Thrift Management Group), the Pension & Thrift Management Group (which makes recommendations to the Pension Review Committee), and  the Employer Benefits Committee (a 3-member, company-appointed committee responsible for overseeing ABB's employee benefits program) (collectively "ABB" or "ABB Defendants").  Id. at *1, 14.  The Fidelity defendants are Fidelity Trust and Fidelity Management & Research Company ("Fidelity Research") (collectively "Fidelity," unless otherwise specified to distinguish among different Fidelity components).  Id. at *1.

2

investment options for the Plans in an Investment Policy Statement ("IPS"). Id. at
*13. The IPS states that at "all times … [revenue sharing] rebates will be used to
offset or reduce the cost of providing administrative services to plan participants."
Id. at *8, 13.

### 1. **Revenue Sharing**

When the Plans first hired Fidelity for recordkeeping, they compensated
Fidelity based on a per-person fee paid directly by ABB. Id. at *2, 9. Over time,
"revenue sharing" replaced per-participant fees as the primary means of
compensating Fidelity for its services. "Revenue sharing" occurs where mutual
funds pay a portion of investor fees (reflected in the funds' expense ratios) to a
third party. Here, Fidelity received payments from the investment companies
whose mutual funds were on the Plans' platform of investment choices. Id. at *9.
Although plan participants knew that mutual fund expenses were deducted from
fund assets, they were not advised of the amounts paid to Fidelity for
recordkeeping. Id. By 2001, participants in the Non-Union Plan solely
compensated Fidelity via revenue sharing, while the Union Plan paid Fidelity $8
per-person in addition to revenue sharing. Id. at *9.

By 2001, Fidelity also had a "revenue neutrality" provision in its contract
with ABB, Inc., which specified that Fidelity's fees would be adjusted if they rose
above or fell below the parties' fee projections by a specified percentage. Id. at

3

*13, 26.  The district court determined that ABB replaced the Fidelity Magellan fund in 2005 with other, more expensive, funds, in part, as a means of avoiding triggering the neutrality provision, which would have required ABB to pay Fidelity a per-person fee.  Id. at *27.

## 2.    Fidelity's Provision of Non-Plan Benefits to ABB

Between 1995 and 2004, Fidelity began providing services to ABB, Inc. in addition to recordkeeping for the Plans.  Id. at *2.  Fidelity began performing recordkeeping in 1997 for ABB, Inc.'s defined benefit plans; similar services for the health and welfare plans in 1999 and 2000; and corporate payroll services in 2004.  Id.

Also in 2005, ABB, Inc. and Fidelity negotiated a new comprehensive agreement governing both Fidelity's provision of these other services for ABB, Inc. and Fidelity's receipt of recordkeeping fees from the Plans.  In negotiations, Fidelity informed ABB that its revenue sharing from the Plans' funds permitted it to provide other corporate services for less than cost.  Id. at *2, 29.  Although Mercer Consulting expressed concern about the possibility that the Plans were subsidizing these other corporate expenses, the Plans' fiduciaries did not investigate the cross-subsidization or make efforts to stop the practice.  Id. at *29.

4

### 3. ABB's Replacement of the Vanguard Wellington Fund with the Fidelity Freedom Funds

At a 2000 meeting, John Cutler, then Director of ABB's Pension & Thrift Management Group, suggested that the Plans offer participants a "lifecycle" or "target-date" fund (a type of fund that automatically changes investments as the participant ages). Id. at *17. Cutler also recommended that the Pension Review Committee remove the Vanguard Wellington Fund from the plan platform due to "deteriorating performance." Id. at *18. Cutler did not discuss any details of the Wellington Fund's historic performance, which in fact exceeded the Morningstar benchmark by 4% between 1996 and 2000. Id. at *17, 18. Based on this meeting, ABB's Pension & Thrift Management Group considered three target-date funds for inclusion on the plan platform, ultimately recommending that Fidelity Freedom Funds replace the Vanguard Wellington Fund. Id. at *18. The Committee then removed the Wellington Fund and added the Fidelity Freedom Funds. Id. at *19. The Committee also eliminated per-participant recordkeeping fees for the Non-Union Plan, and imposed an $8 per-person fee for the Union Plan. As a result of the switch to the Freedom Funds, Fidelity received additional fees through revenue sharing while the fees paid by ABB were reduced. Id. at *21

### B. The District Court's Decision

Plaintiffs sued the ABB and Fidelity defendants in 2006, alleging violations of fiduciary duties and prohibited transactions. See 29 U.S.C. §§ 1104 (fiduciary

Appellate Case: 12-2056     Page: 10     Date Filed: 06/18/2013 Entry ID: 4046306

duty), 1106 (prohibited transactions). After a four-week trial, the district court issued a decision that was mostly favorable to the plaintiffs, concluding that the fiduciaries violated their duties by overpaying Fidelity via revenue sharing fees.

1. The district court noted that the revenue sharing arrangement was not a per se violation of ERISA's fiduciary duties, but concluded that, in this case, the ABB fiduciaries acted imprudently by failing to diligently investigate or properly monitor recordkeeping costs, thereby causing the Plan to overpay for Fidelity's services. Tussey, 2012 WL 1113291, at *15. The court found that the fiduciaries never calculated what Fidelity was receiving or the Plans were paying for its services, never determined if the pricing was competitive or if the Plans were instead paying above-market prices for Fidelity's services, and never investigated whether the Plans could have obtained a better deal based on the Plans' size and considerable leverage as a billion-dollar investor. Id. at *10-11, 14-15. Although ABB chose to compensate Fidelity through revenue sharing, it made no effort to monitor the practice to determine whether the revenue sharing was merely offsetting the actual costs of recordkeeping or whether it was in fact subsidizing other services Fidelity provided to ABB. Id. In addition, the court determined that ABB acted imprudently when it selected a variety of funds for the Plan that had higher fees than equally or better performing alternatives. The court concluded

Appellate Case: 12-2056   Page: 11   Date Filed: 06/18/2013 Entry ID: 4046306

that ABB chose these funds so that it could avoid having the participants pay the fees directly or paying them itself (as was its practice).  Id. at *21-22, 26-29.

As a result of the fiduciaries' lack of diligence, the district court concluded that the Plans and their participants substantially overpaid for Fidelity's recordkeeping services.  For example, the district court found that in 2007 Plan participants effectively paid $180 per-head to Fidelity, whereas a reasonable per-head charge based on comparable plans at other companies would have been $44.  Id. at *11.  The court also determined that Fidelity Trust generated more revenue through the ABB Plans than it received from its other customers.  Id. at *12.

The district court determined that the fiduciaries breached their duties of prudence and loyalty by causing participants to pay above-market fees to Fidelity for recordkeeping services, and effectively using the fees to subsidize corporate services provided to ABB by Fidelity, as flagged by the Plans' own consultant.  Id. at *30.  Similarly, the court specifically found that "the ABB fiduciaries were not concerned about the cost of recordkeeping unless it increased ABB expenses or caused the PRISM Plans to be less attractive to its employees as a result of hard-dollar, per-participation fees being charged."  Id. at *11; see also id. at *29.[2]

---

[2]  The district court found in ABB's favor on several points as well, concluding, for example, that it was not imprudent for ABB to limit the number of separate or co-mingled accounts.  Id. at *30-31.  The district court also concluded that Fidelity did not breach its fiduciary responsibilities with respect to revenue sharing because

7

2.  The district court also determined that the Plans' Pension Review Committee employed an improper process when, on the recommendations of Mr. Cutler and the Pension & Thrift Management Group he directed, the Committee removed the Vanguard Wellington Fund from the Plan platforms and replaced it with Fidelity's Freedom Funds.  Id. at *2, 19.  The court found that the ABB Defendants failed to consider the relative merits of the Wellington Fund and Freedom Funds, and instead focused on improper factors, such as what was most cost effective for ABB.  Id. at *20.  Thus, the court concluded that the Committee switched the fund in order to create more revenue sharing for Fidelity and to reduce ABB's direct hard-dollar fee payments, even though the switch resulted in higher costs to the Plans' participants.  Id. at *20-21.

In so doing, the ABB Defendants breached their duties of prudence, loyalty, and adherence to plan documents.  Id. at *22-23.  In this regard, the court held that the Investment Policy Statement (IPS), which was adopted by the Pension Review Committee in 2000 to establish guidelines for selecting and monitoring investments, id. at *13, 17, was a plan document.  Id. at *14 (citing 29 C.F.R. § 2509.94-2 (1994)).  Moreover, the court found that the IPS specifically outlines the process for removing a fund from the Plan platforms, and requires the monitoring of underperforming funds and their placement on a "watch list" prior to removing

Fidelity was unaware of how ABB internally covered the cost of certain per-participant fees.  Id. at *16.

Appellate Case: 12-2056     Page: 13     Date Filed: 06/18/2013 Entry ID: 4046306

them.  Id. at *22.  Because no ABB fiduciary engaged in this process when they decided to remove the Wellington Fund, which had consistently performed well, the court concluded that the ABB Defendants acted imprudently and in violation of Plan documents.  The court also found that Cutler violated his duty of loyalty because he recommended moving Plan assets from the Wellington Fund to the Freedom Funds in order to secure benefits to ABB, Inc. rather than Plan participants.  Id. at *23.

The district court further found that the ABB fiduciaries committed a prohibited transaction under ERISA section 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D) by transferring Plan assets from the Wellington Fund to the Freedom Funds in order to benefit ABB, Inc., a party-in-interest to the Plans.  ABB Inc. benefited from the switch by reducing its out-of-pocket recordkeeping costs for the Plans, and by receiving subsidized services for non-Plan activities.  Id. at *23-24.  However, the court concluded that Fidelity Trust did not commit a prohibited transaction because Fidelity Trust was not a fiduciary when it communicated pricing terms to ABB, Inc.  Id. at *24.

The district court found that the ABB Defendants' violations occurred within the six-year statute of limitations, 29 U.S.C. § 1113(1), although the Defendants argued that the statute of limitations had expired because they had decided to change funds by December 29, 2000.  The court rejected this argument, finding

9

that the decision to transfer the assets to the Freedom Funds could have been reversed any time until the assets were actually transferred in 2001.  Id. at *25 ("the final fiduciary acts [triggering the limitations period] were the execution of the mapping and the execution of the Trust Agreement amendments").

3.  Finally, as relevant to this brief, the district court held that the ABB Defendants violated ERISA section 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D), by not following the IPS's requirement that revenue sharing be used to "offset or reduce the cost of providing administrative services to plan participants."  Id. at *13.  Instead, the Defendants had permitted Fidelity to take revenue sharing at above-market rates for its recordkeeping services and used the arrangement to cover other ABB, Inc. expenses.  Id.  Moreover, the ABB Defendants had not determined how much Fidelity was receiving in revenue sharing, a necessary precondition for ensuring that the revenue sharing was merely offsetting the cost of recordkeeping.  Id. at *15.

## SUMMARY OF ARGUMENT

1.  The district court correctly decided that the ABB Defendants violated their duties of prudence and loyalty with respect to the revenue sharing fees that the Plans paid to Fidelity Trust.  Despite being required to diligently research fees, the ABB Defendants never calculated what Fidelity Trust was receiving in fees, benchmarked against the market whether such fees were reasonable, or researched

10

whether the Plans could have received lower fees based on their large size and negotiating leverage. These prudence violations were amplified by the ABB Defendants' loyalty violations, most egregiously ABB's acceptance of below-market corporate services from Fidelity in exchange for Fidelity's receipt of above-market recordkeeping fees from the Plans. Despite knowledge of this cross-subsidization, the ABB Defendants never even performed further investigation. Substitution of the Fidelity Freedom Funds for the Vanguard Wellington Fund was exemplary of imprudent and disloyal decision-making resulting in excessive fees.

2. The district court correctly determined that the statute of limitations had not run on the plaintiffs' claims challenging the transfer of Plan assets from the Wellington Fund into the Freedom Funds. ERISA's six-year limitations period does not begin to run until "the date of the last action which constituted part of the breach or violation." ABB's argument that the statute of limitations expired necessarily requires that this Court disregard the fact that the actual transfer of the funds and amendment of the trust agreement – essential portions of the fiduciary violation -- indisputably occurred inside the six-year limitations period.

3. Under longstanding interpretive guidance by the Secretary, a statement of investment policy issued by a named fiduciary authorized to appoint investment managers is a plan document that fiduciaries are required to follow unless doing so would violate ERISA. Accordingly, the district court correctly determined that the

11

ABB fiduciaries violated their fiduciary duties when they failed to comply with the Plans' own requirements, as expressed in the Investment Policy Statement, that revenue sharing be used to offset or reduce the cost of providing administrative services to the Plans.

## ARGUMENT

## I. The District Court Correctly Concluded that Defendants Acted Imprudently and Disloyally With Regard to Recordkeeping Fees

1.  Revenue sharing is a form of compensation that a plan pays indirectly to plan service providers.[3] Consistent with ERISA's prudence requirement, a plan fiduciary should identify all forms of "indirect compensation" received by plan service providers and ensure that it is not overpaying for plan services. ERISA allows service arrangements between plans and service providers only if both the arrangements and the compensation involved are reasonable. 29 U.S.C. §§ 1106(a)(1)(C) and 1108(b)(2).

While the Department's regulations addressing revenue sharing disclosure were promulgated in 2012, all ERISA fiduciaries, including the ABB Defendants, were subject to ERISA's duties of prudence, loyalty, and adherence to plan

---

[3] Regulations issued by the Department in 2012 specifically require many service providers to disclose the indirect compensation that they or their affiliates expect to receive. 29 C.F.R. §2550.408b-2(c)(1). In addition, participants who have the ability to direct the investment of their individual plan accounts must receive disclosure of the expenses related to the available investment products, including revenue sharing expenses. 29 C.F.R.§2550.404a-5(d)(1)(iv).

Appellate Case: 12-2056    Page: 17    Date Filed: 06/18/2013 Entry ID: 4046306

documents at all relevant times prior to 2012, including the duty to avoid paying service providers excessive fees.  See Tibble v. Edison Int'l, 711 F.3d 1061, 1087 (9th Cir. 2013) (fiduciaries have a duty to review fees of mutual funds); Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 595 (8th Cir. 2009) (denying motion to dismiss claims alleging that fiduciaries violated duties of prudence and loyalty by causing participants to pay excessive fees); Schaefer v. Ark. Med. Soc'y, 853 F.2d 1487, 1491 (8th Cir. 1988) (fiduciaries must "investigate all decisions that will affect the pension plan").

The Eighth Circuit reviews prudence allegations based on the circumstances prevailing at the time of the decision without benefit of hindsight.  Roth v. Sawyer-Cleator Lumber Co., 16 F.3d 915, 918 (8th Cir. 1994) ("…a fiduciary is obligated to investigate all decisions that will affect the pension plan, and must act in the best interests of the beneficiaries.") (citations and internal quotes omitted).  The prudence standard is an objective standard focused on whether fiduciaries "employed the appropriate methods to investigate the merits of the investment and to structure the investment."  Katsaros v. Cody, 744 F.2d 270, 279 (2d Cir. 1984); accord Braden, 588 F.3d at 595.  Plan fiduciaries breach their duty of loyalty when they subordinate the financial interests of the plan to the interests of other parties, such as the plan sponsor, Braden, 588 F.3d at 599-600.

13

2.  In its holdings that the ABB fiduciaries violated the duty of prudence, the district court found, based on the factual record established during the trial, that ABB failed to:  calculate the dollar amount of recordkeeping fees that the Plans paid to Fidelity through revenue sharing; leverage its size to lower recordkeeping costs or obtain a benchmark cost of Fidelity's services prior to choosing revenue sharing; investigate whether the Plans were cross-subsidizing Fidelity's below-market provision of corporate services; or determine the fair market price of recordkeeping fees.  Tussey, 2012 WL 1113291, at *10.  The district court also reasonably found that ABB failed to employ a proper process before deciding to drop the Vanguard Wellington Fund and move (or "map") its assets into the target-date Fidelity Freedom Funds, id. at *23.  Similarly, the court reasonably found that the ABB Defendants deliberately replaced the Fidelity Magellan Fund with higher fee Fidelity funds in order to assure Fidelity a minimum level of fees pursuant to ABB's "revenue neutrality agreement" with Fidelity.  Id. at *27.

ABB has not demonstrated on appeal that these findings are clearly erroneous as required by Fed. R. Civ. P. 52(a).  Instead, ABB argues that it was procedurally prudent because it had concluded that the overall fee expenses of the funds in the Plan were reasonable.  ABB Brief at 50.  But the district court rightly rejected the defendants' argument that it need only consider mutual fund expense ratios, without regard to the Plans' total costs, the reasonableness of those costs, or

14

the fiduciaries' process for monitoring and determining the Plans' expense structure.  Id. at *10.  According to the court, the Plans effectively paid over $13 million more than they should have for Fidelity's services during the class period because of the fiduciaries' deliberate attempt to reduce costs to ABB and their failure to monitor recordkeeping expenses and to negotiate appropriate rebates from the revenue sharing that Fidelity received for plan business.  Id. at *36-37.  As the court recognized, the mutual funds' expense ratios by themselves do not show how much revenue flows to the record keeper; reveal whether the record keeper is getting more or less than competitive rates; or account for the size and thus negotiating leverage of the Plans.  Id. at *10.  After review of such factors, the court reasonably held that Fidelity was being substantially overcompensated at the expense of the Plans and their participants.

Moreover, the court found not only that the Plans had paid too much but also that the fiduciaries had failed to adequately investigate the Fidelity fees in the first place or even determine how much Fidelity received for its services.  Thus, the court reasonably held that the fiduciaries' actions were both procedurally and substantively imprudent.  The test of procedural prudence is whether the fiduciaries "at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment."  Donovan v. Mazzola, 716 F.2d 1226, 1232 (9th Cir. 1983).  Here, the

Appellate Case: 12-2056    Page: 20    Date Filed: 06/18/2013 Entry ID: 4046306

district court found that the fiduciary defendants had failed to investigate the amount or reasonableness of the fees the Plans were paying Fidelity, even though such fees are a critical determinant of what the participants will receive on retirement.[4] Even if the court had not found that Fidelity's fees were excessive, this failure of process constitutes imprudence. See Tibble, 711 F.3d at 1082 (duty of prudence inquiry directed towards both the "merits of the transaction and the thoroughness of the *investigation* into the merits of the transaction" (internal quotations omitted)).

Thus, in Braden, this Court focused both on process and substance in holding that plan participants stated a claim for imprudence by alleging that the investment decisions made by fiduciaries of the Walmart plan were "tainted by failure of effort, competence, or loyalty," 588 F.3d at 596, and that this failure led to the inclusion of unduly expensive retail mutual funds on a 401(k) plan's investment menu when they could have offered equivalent – but less expensive – investments in institutional funds. Id. at 595.

Similarly, the Ninth Circuit in Tibble, 711 F.3d 1061, upheld a district court decision after a bench trial that plan fiduciaries had imprudently included retail-

---

[4] Even a small increase in plan expenses can dramatically reduce the amount that participants receive in retirement. For example, a mere one percentage point difference in fees can result in a 28% reduction in the value of a worker's early career savings when he retires at the end of his career. EBSA, A Look at 401(k) Plan Fees (Oct. 2010), available at http://www.dol.gov/ebsa/publications/401k_employee.html.

Appellate Case: 12-2056    Page: 21    Date Filed: 06/18/2013 Entry ID: 4046306

class shares of three specific mutual funds on a plan menu because they failed to investigate the possibility of less expensive institutional-share class alternatives. The Ninth Circuit noted that an experienced investor would have explored institutional class shares, whereas there was an "utter absence of evidence" that the fiduciaries in the case investigated this possibility. Id. at 1087. While the court found no per se rule requiring institutional class shares, prudence required an investigation of the possibility. Id.

Braden is, of course, the controlling law of this Circuit. As in Braden, the district court here correctly held that the ABB Defendants' procedural imprudence caused or contributed to substantive imprudence, which in this case constituted the overpayment of revenue-sharing fees to Fidelity and the distortion of plan investment decisions to enhance Fidelity's fees or to minimize ABB's costs at the expense of the participants' interests.

3. The district court also properly concluded that the defendants' lack of diligence was partly attributable to ABB's conflicting interest in using the revenue sharing to offset ABB expenses unrelated to the Plan. At a minimum, the presence of such conflicts of interest should have counseled the fiduciaries to exercise special care to insulate the plans from bias. See, e.g., Howard v. Shay, 100 F.3d 1484, 1488-89 (9th Cir. 1996) (citing Leigh v. Engle, 727 F.2d 113, 125-26 (7th Cir. 1984)) (holding that fiduciaries need to "engage in an intensive and scrupulous

17

independent investigation of [the fiduciary's] options" when confronted with a conflict of interest). Instead, the fiduciaries disregarded evidence that the Plans were effectively subsidizing other ABB, Inc. expenses, and did nothing to ascertain the reasonableness of the Plans' fees in the competitive market for recordkeeping and investment services. Similarly, the defendants failed to negotiate with Fidelity for a better price on recordkeeping fees that would have benefited the Plans, but might have eliminated the Plans' subsidization of corporate expenses or required up-front disclosure of the Plans' costs. See, e.g., Howard, 100 F.3d at 1489. Braden is controlling on the question of disloyalty here as well. In that case, the fiduciaries of the Walmart plan failed to disclose conflicts of interest with respect to revenue sharing arrangements to the plan's participants. The plaintiffs alleged that the plan's trustee (Merrill Lynch) had included certain mutual funds on the plan platform in exchange for its direct receipt of revenue sharing payments from these same mutual funds. Although the plaintiffs had not sued the trustee, they had alleged that the other plan fiduciaries had breached their duty of loyalty by failing to disclose the conflicted revenue sharing arrangements. In vacating the district court's dismissal of the complaint, this Court noted that, while there was no blanket obligation to disclose revenue sharing fees, the complaint's factual assertions were "sufficient to state a claim that appellees breached their duty of loyalty by failing to disclose details about the revenue sharing payments [inasmuch as] . . . each fund

18

was selected for inclusion in the Plan because it made payments to the trustee, and not because it was a prudent investment." Braden, 588 F.3d at 599-600. The Court further held that the complaint stated a prohibited transaction claim under ERISA section 406(a)(1)(C). 588 F.3d at 601 (finding that the arrangement between the plan and Merrill Lynch, a party in interest, "amounts to a 'direct or indirect . . . furnishing of services . . . between the plan and a party in interest'").

Braden thus establishes that plan fiduciaries cannot put their own or the plan sponsor's interests ahead of the plan when negotiating and monitoring revenue sharing arrangements. The district court in this case issued numerous factual findings that the ABB fiduciaries' decisions regarding revenue sharing were ultimately motivated by a desire to benefit ABB, Inc. rather than Plan participants. Tussey, 2012 WL 1113291, at *21, 23, 27-30. On review, these findings of fact cannot be set aside unless they are clearly erroneous. Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 498 (1984) (interpreting Fed. R. Civ. P. 52(a)). The ABB defendants essentially attempt to re-argue the facts underlying the duty of loyalty holdings, but fall far short of demonstrating that the district court's factual findings are clearly erroneous.

4. ABB erroneously argues that the broad range of investment options with reasonable fees on the Plan platform bars the claim of unreasonable recordkeeping fees with respect to any particular fund. ABB Brief at 44-46. As an initial matter,

19

the district court found that the Plan's fees were excessive compared to plans of similar size.  Id. at *12.  Thus, even if ABB were legally correct that a fiduciary could insulate itself from liability by offering a generally reasonable fee structure, this condition is not met in this case.

A fiduciary cannot, however, insulate itself from fiduciary violations by offering a broad range of funds with reasonable fees on average (or a mix of funds with a range of fees).  So long as some funds charging excessive fees are among the options, the fiduciary is liable to that extent for imprudence in the selection of overpriced funds when comparable funds with reasonable fees were available or the fiduciary could have used the plan's bargaining power to negotiate lower fees from the same funds.

As support for a contrary legal proposition, ABB relies principally on Hecker v. Deere & Co., 556 F.3d 575, 579 (7th Cir. 2009), and Renfro v. Unisys Corp., 671 F.3d 314 (3d Cir. 2011).  However, neither Hecker nor Renfro supports the proposition that fiduciaries can defeat imprudence claims merely by including a large number of fund options with varying expense structures.  In a supplemental opinion denying plaintiffs' rehearing request, 569 F.3d 708 (2009), the Hecker panel, id. at 711, rejected just such an approach:

> The Secretary also fears that our opinion could be read as a sweeping statement that any Plan fiduciary can insulate itself from liability by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the

20

responsibility for choosing among them. She is right to criticize such a strategy. It could result in the inclusion of many investment alternatives that a responsible fiduciary should exclude. It also would place an unreasonable burden on unsophisticated plan participants who do not have the resources to pre-screen investment alternatives. The panel's opinion, however, was not intended to give a green light to such "obvious, even reckless, imprudence in the selection of investments" (as the Secretary puts it in her brief). Instead, the opinion was tethered closely to the facts before the court.

Similarly, Renfro merely determined that, under the facts pled in that case, the wide range of investment options was one indication that the plan sponsor's selection of investment options was prudent. Neither Renfro nor Hecker ever indicated that the sheer number of investment options on a fund menu could be dispositive, much less that it could outweigh specific evidence that the fiduciaries had used revenue sharing to benefit themselves at plan expense, paid substantially more than market rates for plan services, failed to leverage its bargaining power to negotiate lower fees or neglected even to determine how much the plan was paying for its plan services, as the district court found here after trial.

5. ABB also argues that the district court incorrectly determined that the process for deciding to replace the Vanguard Wellington Fund with the Fidelity Freedom Funds violated fiduciary standards (including the Pension Review Committee's duty to abide by the IPS's instructions for de-selecting or selecting funds, provided the instructions comported with the statutory requirements of prudence and loyalty). ABB Brief at 34-38. The district court's holding, however,

Appellate Case: 12-2056    Page: 26    Date Filed: 06/18/2013 Entry ID: 4046306

was supported by numerous factual findings, including that Cutler, as head of the Pension and Thrift Management Group, did not consider the relative merits of the Vanguard Wellington Fund and Fidelity Freedom Funds when recommending this switch of funds to the Committee, but instead improperly considered whether the changes would benefit ABB; and that the Committee agreed to the switch for that reason. Tussey, 2012 WL 1113291, at *20-21. ABB does not argue that the court applied an erroneous legal standard in holding that these and other associated facts amounted to imprudent and disloyal conduct by the ABB defendants, and its counter-recitation of the facts does not demonstrate that the district court's numerous factual findings on this issue were clearly erroneous pursuant to Rule 52(a)'s standard. Id. at *17-22.

## II.     The ABB Fiduciaries Substituted the Fidelity Freedom Funds for the Vanguard Wellington Fund Within the Statutory Limitations Period

The district court reasonably determined that ABB's decision to drop the Vanguard Wellington Fund and add the Fidelity Freedom Funds fell within ERISA's six-year statute of limitations, ERISA section 413, 29 U.S.C. § 1113, because no final decision had been made prior to December 29, 2000 (six years before the December 29, 2006 complaint). Tussey, 2012 WL 1113291, at *25-26; see also id. at *21 ("All of the changes made to the plan's investment platform were finalized when the Trust Agreement was revised in 2001.").

Appellate Case: 12-2056     Page: 27     Date Filed: 06/18/2013 Entry ID: 4046306

ABB argues that the statute of limitations had run because the Pension Review Committee's decision to drop Wellington and to substitute the Freedom Funds occurred prior to December 29, 2000. ABB Brief at 32. Relying on a recent Fourth Circuit decision, ABB argues that subsequent acts in carrying out the decision were non-fiduciary ministerial acts that did not affect the commencement of the statute of limitations. See David v. Alphin, 704 F.3d 327, 342 (4th Cir. 2013) (claims alleging that funds on plan platform were improperly selected and maintained accrued from date of selection), reh'g denied Mar. 12, 2013.

The Defendants' reliance on Alphin is misplaced. Unlike in Alphin, where the court concluded that the challenged decision to invest in certain funds and the first investment in those funds was made outside the statutory period, in this case, the actual events being challenged – the addition of the Fidelity Freedom Funds and the subsequent transfer of the Plan assets from the Vanguard Wellington Fund to the Freedom Funds, and the final decision to take these actions – occurred in 2001, within the statutory period, when the Trust Agreement was amended to make these changes. Tussey, 2012 WL 1113291, at *25 (stating that the Committee's earlier "mapping" decision in November 2000 was "always subject to reconsideration" and therefore not the final decision).

Moreover, as the District Court held, id., the decisions to add the Fidelity Freedom Funds and transfer plan assets from the Wellington Fund into the

23

Freedom Funds were not, as ABB asserts, purely ministerial acts. The fiduciaries'

role in administering the mapping of Plan assets from the Wellington Fund to the

Freedom Funds also differs significantly from the facts in <u>Delaware State College</u>

<u>v. Ricks</u>, 449 U.S. 250 (1980), cited by ABB. In <u>Ricks</u>, the Supreme Court ruled

that the limitations period for challenging an improper employment decision

(denial of tenure) under Title VII commenced upon the decision itself rather than

the subsequent date when the decision's consequence took effect (termination of

employment). <u>Id.</u> at 61. In this case, the fiduciary acts of moving the Plans' assets

from the Wellington Fund to the Freedom Funds constituted the essential part of

the violation, not the mere effect of it. ERISA's six-year limitations period does

not lapse until six years after "the last action which constituted a part of the breach

or violation." 29 U.S.C. § 1113. The district court was correct to consider any

deliberation before the actual change of funds to be revocable and not the requisite

"last action."

   ABB also argues that the decision to transfer funds from the Vanguard

Wellington Fund to the Fidelity Freedom Funds was a matter of plan design rather

than plan administration, and as such was not subject to ERISA's fiduciary

provisions. ABB Brief at 33. But the cases that ABB cites – <u>Hughes Aircraft Co.</u>

<u>v. Jacobson</u>, 525 U.S. 432 (1999) and <u>Lockheed Co. v. Spink</u>, 517 U.S. 882 (1996)

– simply stand for the proposition that amendments to a plan's terms, eligibility, or

Appellate Case: 12-2056    Page: 29    Date Filed: 06/18/2013 Entry ID: 4046306

benefits are settlor in nature.  By contrast, here the fiduciaries charged with

managing the Plans' investments both made the decision to change the investment

and carried out that change.  In this respect, the defendants' actions were no

different than any other fiduciary decisions made in connection with the

management, control, or investment of plan assets during the life of the Plans.

**III.    The District Court Properly Concluded that the IPS Was a Plan Document that Defendants Improperly Failed to Follow**

1.  ABB argues on appeal that the IPS is not a plan document.  ABB Brief at

18-22.  ABB asserts that only documents adopted pursuant to a formal procedure

may become plan documents, and that the Pension Review Committee lacked

authority to carry out the necessary procedure.  ABB Brief at 19-20.

As an initial matter, whether or not the IPS is a plan document, in each

instance that the district court determined that the IPS was violated, the court also

determined that fiduciaries had also violated their duties of prudence or loyalty.

Tussey, 2012 WL 1113291, at *15, 22.  Thus, even if this Court concludes that the

IPS was not a plan document, the district court's holdings regarding revenue

sharing and the transfer of plan assets from the Vanguard Wellington Fund to the

Fidelity Freedom Funds remain correct.

In any event, the court correctly concluded that the IPS is a plan document.

As the court noted, the Department in 1994 issued an interpretive bulletin

addressing fiduciary standards applicable to such written statements of investment

25

policy.  29 C.F.R. § 2509.94–2 (1994) (superseded in 2008 by 29 C.F.R. 2509.08-2).  Under the Department's guidance, an investment policy that has been explicitly adopted by the fiduciaries charged with managing the plan's assets is a governing plan document:

> Statements of investment policy issued by a named fiduciary authorized to appoint investment managers would be part of the 'documents and instruments governing the plan' within the meaning of ERISA § 404(a)(1)(D).  An investment manager to whom such investment policy applies would be required to comply with such policy, pursuant to ERISA Sec. 404(a)(1)(D) insofar as the policy directives or guidelines are consistent with titles I and IV of ERISA.

Id.  Many courts have cited this Department of Labor interpretive bulletin in ruling that investment policy statements like the IPS in this case are plan documents.  See California Ironworkers Field Pension Trust v. Loomis Sayles & Co., 259 F.3d 1036, 1042 (9th Cir. 2001); Alder v. B.C. Ziegler & Co., 01-C-1119, 2006 WL 2380631, at *10 (E.D. Wis. Aug. 16, 2006); Phelps v. Qwest Employees Ben. Comm, Civ. 04CV02042LTBOES, 2005 WL 3280239, at *4 (D. Colo. Dec. 2, 2005).  Cf. Tibble, 711 F.3d at 1071 (giving deference to DOL interpretations of its own regulations).

ABB argues that only ABB's board of directors and the Employee Benefits Committee had the ability to amend the Plan, and thus only these entities could have adopted an investment policy.  ABB further cites Cigna Corp. v. Amara, 131 S. Ct. 1866 (2011), for the proposition that a plan sponsor creates the terms and

Appellate Case: 12-2056     Page: 31     Date Filed: 06/18/2013 Entry ID: 4046306

conditions of the plan and sets forth the procedure for amending the written instrument underlying the plan.  ABB Brief at 19-20.  But even if the ABB board of directors did not formally adopt the IPS, it does not alter the fact that the fiduciary actually charged by ABB, Inc. with managing the investments of the Plans, the Pension Review Committee, formally adopted the IPS as a plan document under the authority the Plans conferred on it "to control and manage the investment of the assets of the Plan" (Trial Exhibit DA-1061 at ABB-KEN-00048281, listing the responsibilities of the PRC).  Indeed, adopting an investment policy statement is both prudent and commonplace for fiduciaries exercising authority over hundreds of millions of dollars of plan assets.  Moreover, <u>Amara</u> concerned whether a Summary Plan Description may be enforced in a suit for plan benefits under Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), not whether a fiduciary's failure to comply with an IPS formally adopted by a plan fiduciary violates section 404(a)(1)(D), 29 U.S.C. § 1132(a)(1)(D), which requires a fiduciary to discharge his duties "in accordance with the documents and instruments governing the plan" unless it would violate ERISA to do so.  Nothing in <u>Amara</u> prohibits treating the IPS as a governing plan document.

Because the district court correctly determined that the IPS is a governing plan document, the fiduciaries were bound to follow its terms requiring that revenue sharing be used at "all times . . . to offset or reduce the cost of providing

27

administrative services to plan participants" – a requirement that is wholly

consistent with ERISA. <u>Tussey</u>, 2012 WL 1113291, at *14. The district court held

that the Plan fiduciaries did not comply with this directive because they did not

even engage in the minimal analysis necessary to determine how much revenue

sharing Fidelity was receiving. <u>Id.</u> Given the Defendants' lack of diligence, and

their improper focus on defraying corporate expenses rather than reducing the costs

of providing services to plan participants, this Court should uphold the court's

decision in this regard.

     2. ABB also argues that the district court should have deferred to the Plan

fiduciaries' interpretation of the IPS, in light of their purported discretion to

interpret the document. ABB Brief at 24-25. Yet the ABB Defendants do not

point to any contrary prior construction of the IPS language. Moreover, the IPS

requirement that the fiduciaries ensure that "at all times . . . rebates will be used to

offset or reduce the cost of providing administrative services to the plan," <u>Tussey</u>,

2012 WL 1113291, at *13, is stated in mandatory terms. Even under an abuse of

discretion standard, therefore, the district court's numerous factual findings – <u>e.g.</u>,

that the ABB Defendants never determined the amount of revenue sharing Fidelity

received, examined the use of the payments, or took any action to prevent the use

of revenue sharing to subsidize ABB's corporate expenses — compel the

conclusion that the ABB fiduciaries abused their discretion. The quoted IPS

Appellate Case: 12-2056   Page: 33   Date Filed: 06/18/2013 Entry ID: 4046306

language cannot reasonably be interpreted to authorize rebates to be used to offset ABB's costs rather than the Plan's, as the court determined.  In light of these factual determinations and the deference that the Eighth Circuit must afford to factual findings that are not clearly erroneous, this Court should affirm the district court's finding that the ABB Defendants violated the IPS in choosing a revenue sharing scheme that, by cross-subsidizing non-Plan functions for which Fidelity also provided recordkeeping services, was not "at all times . . . used to offset or reduce the cost of providing administrative services to the plan."

29

## **CONCLUSION**

For the foregoing reasons, the Secretary respectfully requests the Court

affirm the district court's order with respect to the three issues discussed.

Respectfully submitted,

M. PATRICIA SMITH
Solicitor of Labor

TIMOTHY D. HAUSER
Associate Solicitor

NATHANIEL I. SPILLER
Counsel for Appellate Litigation

/s/ David Ellis
DAVID ELLIS
Attorney
U.S. Department of Labor
200 Constitution Ave. N.W.
Rm. N-4611
Washington, DC 20210
(202) 693-5688
Fax: (202) 693-5610

30

## CERTIFICATE OF COMPLIANCE WITH RULE 32A

I hereby certify that this brief complies with Federal Rule of Appellate Procedure 32(a)(7)(B). It has a total of 6916 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). It has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman font size 14.

Dated: June 17, 2013        <u>s/ David Ellis</u>
                                                 David Ellis
                                                 Attorney

## CERTIFICATE OF SERVICE

I hereby certify on this 17th day of June, 2013, I electronically filed the foregoing amici curiae brief with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ David Ellis
David Ellis
Attorney
