# United States Court of Appeals
## For the Eighth Circuit

_____

No. 12-2056

_____

Ronald C. Tussey; Charles E. Fisher; Timothy Pinnell

*Plaintiffs - Appellees*

v.

ABB, Inc.; John W. Cutler, Jr.; Pension Review Committee of ABB, Inc.; Pension & Thrift Management Group of ABB, Inc.; Employee Benefits Committee of ABB, Inc.

*Defendants - Appellants*

Fidelity Management Trust Company; Fidelity Management & Research Company

*Defendants*

------------------------------

Securities Industry and Financial Markets Association

*Amicus on Behalf of Appellants*

AARP; Barbara Jean Black

*Amici on Behalf of Appellees*

Thomas E. Perez, Secretary of the United States Department of Labor

*Amicus Curiae*

Tamar Frankel; David Webber

*Amici on Behalf of Appellees*
_____

No. 12-2060
_____

Ronald C. Tussey; Charles E. Fisher; Timothy Pinnell

*Plaintiffs - Appellees*

v.

ABB, Inc.; John W. Cutler, Jr.; Pension Review Committee of ABB, Inc.; Pension & Thrift Management Group of ABB, Inc.; Employee Benefits Committee of ABB, Inc.

*Defendants*

Fidelity Management Trust Company; Fidelity Management & Research Company

*Defendants - Appellants*

------------------------------

AARP; Barbara Jean Black; Tamar Frankel; David Webber

*Amici on Behalf of Appellees*
_____

No. 12-3794
_____

Ronald C. Tussey; Charles E. Fisher; Timothy Pinnell

*Plaintiffs - Appellees*

-2-

v.

ABB, Inc.; John W. Cutler, Jr.; Pension Review Committee of ABB, Inc.; Pension & Thrift Management Group of ABB, Inc.; Employee Benefits Committee of ABB, Inc.

*Defendants*

Fidelity Management Trust Company; Fidelity Management & Research Company

*Defendants - Appellants*

------------------------------

AARP; Barbara Jean Black; Tamar Frankel; David Webber

*Amici on Behalf of Appellees*
_____

No. 12-3875
_____

Ronald C. Tussey; Charles E. Fisher; Timothy Pinnell

*Plaintiffs - Appellees*

v.

ABB, Inc.; John W. Cutler, Jr.; Pension Review Committee of ABB, Inc.; Pension & Thrift Management Group of ABB, Inc.; Employee Benefits Committee of ABB, Inc.

*Defendants - Appellants*

-3-

Fidelity Management Trust Company; Fidelity Management & Research Company

*Defendants*

-------------------------------

AARP

*Amicus on Behalf of Appellees*

Thomas E. Perez, Secretary of the United States Department of Labor

*Amicus Curiae*

Barbara Jean Black; Tamar Frankel; David Webber

*Amici on Behalf of Appellees*
_____

Appeal from United States District Court
for the Western District of Missouri - Jefferson City
_____

Submitted: September 24, 2013
Filed: March 19, 2014
_____

Before RILEY, Chief Judge, BRIGHT and BYE, Circuit Judges.
_____

RILEY, Chief Judge.

These consolidated appeals arise from a class action led by Ronald C. Tussey, Charles E. Fisher, and Timothy Pinnell (participants) as representatives of a class of current and former employees of ABB, Inc. (ABB) who participated in two ABB

-4-

retirement plans[1] governed by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 et seq. After a sixteen-day bench trial, the district court entered judgment against the ABB defendants[2] and the Fidelity defendants[3] for breaching their fiduciary duties in violation of 29 U.S.C. §§ 1104, 1106, 1109. The ABB fiduciaries and Fidelity appeal the judgment, damages, and attorney fee award. Although the district court's analysis was sound in many respects, the analysis was not without errors. We affirm in part, reverse in part, and remand for further proceedings.

## I.    BACKGROUND

### A.    The Plan

To attract and retain quality employees, ABB sponsored the Plan, whose stated goal was "to encourage employees to provide additional security and income for their future through a systematic savings program." See 26 U.S.C. § 401(k) (authorizing defined contribution plans for the benefit of employees). Under the Plan, each participant decided how to allocate individual contributions among the investment options selected to be part of the Plan. ABB would match a portion of each contribution, up to six percent of the participant's salary. The Plan, which had an open architecture—meaning investment options came from several

---

[1] ABB offered one plan for union employees (union Plan) and another for unrepresented employees (non-union Plan) (collectively, the Plan).

[2] The ABB defendants (collectively, the ABB fiduciaries) are (1) ABB, the Plan sponsor; (2) ABB's Pension Review Committee (PRC), a named fiduciary responsible for selecting and monitoring the Plan's investment options; (3) ABB's Pension and Thrift Management Group (PTMG), which acts as the staff of the PRC; (4) John Cutler, Jr., ABB's director of the PTMG since 1999; and (5) ABB's Employee Benefits Committee (EBC), a three-member committee appointed by ABB's board to oversee ABB's benefit program and to serve as Plan administrator.

[3] The Fidelity defendants (collectively, Fidelity) are (1) Fidelity Management Trust Company, the Plan trustee and recordkeeper; and (2) Fidelity Management and Research Company, the investment advisor to the Fidelity mutual funds on the Plan.

-5-

sources—generally invested in mutual funds, including Fidelity funds. As of 2000, the Plan held more than $1.4 billion in assets and had more than 14,000 participants.

### B. Revenue Sharing

Fidelity became the recordkeeper for the Plan in 1995 after a competitive bidding process. Initially, ABB paid Fidelity a flat fee for each Plan participant. Beginning in 2000, Fidelity primarily was paid through revenue sharing—a common method of compensation whereby the mutual funds on a defined contribution plan pay a portion of investor fees to a third party. Fidelity received a percentage of the income the Plan investment options received from the participants. By 2001, compensation for the non-union Plan came solely from revenue sharing, whereas ABB paid Fidelity $8 per participant and some revenue sharing for the union Plan.

### C. Other Corporate Services

Over time, Fidelity provided additional administrative services to ABB unrelated to the Plan, including processing ABB's payroll and acting as recordkeeper for ABB's defined benefit plans and health and welfare plans. Fidelity incurred losses from these additional services, but made substantial profits from the Plan. In 2005, ABB and Fidelity negotiated a comprehensive agreement covering both Fidelity's services to the Plan and the other corporate services Fidelity provided to ABB. During negotiations, Fidelity advised ABB that Fidelity provided services for ABB's health and welfare plans at below market cost and did not charge for administering other ABB plans. An outside consulting firm advised ABB it was overpaying for Plan recordkeeping services and cautioned that the revenue sharing Fidelity received under the Plan might have been subsidizing the other corporate services Fidelity provided to ABB. ABB did not act on the information it received.

### D. Plan Redesign

In 2000, a year after Cutler became director of the PTMG, Cutler drafted and the PRC adopted an Investment Policy Statement (IPS), which was designed "to

-6-

provide plan participants with a range of investment options that spanned the risk-return spectrum." The IPS provided a framework for selecting, monitoring, and removing Plan investment options. The IPS contemplated investments in three tiers based on the Plan participants' willingness and ability to make personal asset allocation decisions. Cutler recommended that the Plan offer participants a life-cycle or target-date fund. Such managed allocation funds are dynamically managed to diversify a participant's portfolio across different funds and rebalanced to become more conservative as the participant nears a target retirement date. Cutler also suggested the PRC remove the Vanguard Wellington Fund, a balanced fund, from the investment platform as a result of "deteriorating performance and because participants would be empowered to create their own balanced fund."

The PTMG considered three of the few target-date funds available at the time of the Plan redesign. Of the available funds, Cutler favored the Fidelity Freedom Funds because of their "glide path"—the manner in which the funds changed the asset allocation as the funds approached their respective target retirement dates. On the PTMG's recommendation, the PRC replaced the Wellington Fund with the Freedom Funds. The PRC decided to "map" funds held in the balanced Wellington Fund to the age appropriate Freedom Fund. Mapping creates a default option for participants who do not specify a different investment option when an existing option is being removed. Those participants who chose a different investment option did not have their funds mapped to the Freedom Funds.

### E.    Float

When a Plan participant or ABB made a contribution to the Plan, Fidelity processed the contribution to the Plan investment option designated by the participant and credited the participant's account with shares in that investment option based on the closing share price on the date of the contribution. The Plan became the owner of the selected investment option as of the date the contribution was made and the order was placed, entitling the Plan to any dividends or any other change in the fund that

Appellate Case: 12-2060    Page: 7    Date Filed: 03/19/2014 Entry ID: 4135149

day. The contribution flowed into a depository account held at Deutsche Bank for the benefit of the Plan investment options. For logistical reasons, the contribution could not be distributed to the investment option until the next day. Money sitting in the depository account overnight before it is distributed to the Plan investment options is often described as "float."[4]

As is common practice for such accounts, Fidelity temporarily transferred the funds from the depository account overnight to secured investment vehicles to earn interest often called "float interest" or "float income." The following day Fidelity transferred the principal back to the depository account. Fidelity used the float income to pay fees on float accounts before allocating the remaining income to each investment option choosing to receive it in proportion to the option's share of the overnight account balance. The float income benefitted all the shareholders of the investment option receiving it. Fidelity did not receive the float or float interest.

## F.    Procedural History

On December 29, 2006, the participants sued the ABB fiduciaries and Fidelity, alleging various fiduciary breaches, see 29 U.S.C. § 1104, and prohibited transactions, see 29 U.S.C. § 1106, regarding the administration of the Plan. The participants amended their complaint on July 5, 2007, and the district court certified the class on December 3, 2007. After a sixteen-day bench trial beginning on January 5, 2010, the district court found the ABB fiduciaries and Fidelity "breached some fiduciary duties that they owed to the [] Plan[]." The district court summarized its findings as follows:

---

[4]Fidelity draws a key distinction between "depository" float—the money contributed to purchase shares in a Plan investment option—and "redemption" float—the money withdrawn from a Plan investment option by a participant requesting payment by check while the check remains uncashed. Disbursements are transferred to a redemption account held for the benefit of the investment options and treated in a similar manner to depository float, subject to federal and state tax withholding.

-8-

(1) ABB [fiduciaries] violated their fiduciary duties to the Plan when they failed to monitor recordkeeping costs, failed to negotiate rebates for the Plan from either Fidelity or other investment companies chosen to be on the [Plan] platform, selected more expensive share classes for the [] Plan's investment platform when less expensive share classes were available, and removed the Vanguard Wellington Fund and replaced it with Fidelity's Freedom Funds; (2) ABB[] and the [EBC] violated their fiduciary duties to the Plan when they agreed to pay to Fidelity an amount that exceeded market costs for Plan services in order to subsidize the corporate services provided to ABB by Fidelity, such as ABB's payroll and recordkeeping for ABB's health and welfare plan and its defined benefit plan; (3) Fidelity [] breached its fiduciary duties to the Plan when it failed to distribute float income solely for the interest of the Plan; and (4) Fidelity [] violated its fiduciary duties when it transferred float income to the Plan's investment options instead of the Plan.

Rejecting the participants' "global damages theory" (i.e., "that the breaches infected all of [ABB's] investment decisions" and thus damages should be measured against ABB's defined benefit plan), the district court determined the damages resulting from each breach.  Against the ABB fiduciaries, the district court awarded $13.4 million for failing to control recordkeeping costs and $21.8 million for losses the district court believed the Plan suffered as a result of mapping from the Wellington Fund to the Freedom Funds.  See 29 U.S.C. § 1132(a) (civil enforcement).  The district court awarded $1.7 million against Fidelity for lost float income.  The district court held the ABB fiduciaries and Fidelity jointly and severally liable for more than $13.4 million in attorney fees and costs.  See 29 U.S.C. § 1132(g).  The ABB fiduciaries and Fidelity timely appealed.

## II.    DISCUSSION

"In reviewing a judgment after a bench trial, this court reviews 'the court's factual findings for clear error and its legal conclusions de novo.'"  Outdoor Cent., Inc. v. GreatLodge.com, Inc., 688 F.3d 938, 941 (8th Cir. 2012) (quoting Tadlock v. Powell, 291 F.3d 541, 546 (8th Cir. 2002)); see also Fed. R. Civ. P. 52(a)(6)

-9-

("Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility."). "The district court's determination that a breach of fiduciary duty occurred [under ERISA] represents a legal ruling reviewed *de novo*." Herman v. Mercantile Bank, N.A., 137 F.3d 584, 586 (8th Cir. 1998).

### A.    Fiduciary Discretion

The Plan gave ABB's Plan administrator and its agents "sole and absolute discretion to determine eligibility for, and the amount of, benefits under the Plan and to take any other actions with respect to questions arising in connection with the Plan, including . . . the construction and interpretation of the terms of the Plan." Such a broad grant of discretionary authority entitles the Plan administrator "to deference in exercising that discretion." Conkright v. Frommert, 559 U.S. 506, 509 (2010) (citing Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 111 (1989) (applying trust law principles in determining the appropriate standard of review for ERISA benefit claims)). The district "court reviews the plan administrator's construction of the plan terms for an abuse of discretion; and we review de novo the district court's application of that deferential abuse-of-discretion standard." Sunder v. U.S. Bancorp Pension Plan, 586 F.3d 593, 602 (8th Cir. 2009) (internal citations omitted).

Under an abuse of discretion standard, the Plan administrator's "interpretation will not be disturbed if reasonable." Firestone, 489 U.S. at 111. A reviewing "court must defer to [the fiduciary's] interpretation of the plan so long as it is 'reasonable,' even if the court would interpret the language differently as an original matter." Darvell v. Life Ins. Co. of N. Am., 597 F.3d 929, 935 (8th Cir. 2010) (quoting King v. Hartford Life & Accident Ins. Co., 414 F.3d 994, 999 (8th Cir. 2005) (en banc)). An interpretation is not "invalid merely because [a court] disagree[s] with it, but only if it is unreasonable." Hutchins v. Champion Int'l Corp., 110 F.3d 1341, 1344 (8th

-10-

Cir. 1997). "An interpretation is reasonable if a reasonable person *could* have reached a similar decision, given the evidence before him." Id. (quotation omitted).

The ABB fiduciaries contend the district court erred in failing to afford any discretion to the Plan administrator, particularly with respect to interpreting the IPS.[5] According to the ABB fiduciaries, the district court's de novo "substitution of its views for those of ABB fiduciaries infected its entire analysis." While overstated, the ABB fiduciaries raise a legitimate question about whether the district court applied the appropriate standard of judicial review. The district court's opinion is silent as to the standard of review, and much of the district court's analysis gives little, if any, deference to the Plan administrator's determinations under the Plan documents.

The participants do not argue the district court afforded any deference to the Plan administrator. Rather, they suggest deference only applies "to discretionary *benefits* claim determinations." In the participants' view, federal courts must review fiduciary acts outside the benefit context de novo, otherwise plan sponsors will grant broad discretionary powers to fiduciaries and undermine ERISA's exacting standards. The participants misunderstand the nature of ERISA and ignore the application of trust principles to the exercise of fiduciary discretion under ERISA's provisions. See

---

[5]The ABB fiduciaries maintain the district court erred in (1) finding the IPS was a binding Plan document based on an inapposite interpretive bulletin from the United States Department of Labor, despite "unmet Plan amendment requirements," and (2) assessing liability against the ABB fiduciaries for what the district court perceived to be deviations from the IPS. While we are concerned that construing all investor policy statements as binding plan documents will discourage their use, and we question whether a policy statement like the one in this case—informally implemented to provide a framework for administering the Plan itself—constitutes a binding Plan document, we need not resolve those issues here. In evaluating the ABB fiduciaries' decisions with respect to recordkeeping and selecting Plan investment options, the district court found breaches of the duties of loyalty and prudence independent of the IPS. The ABB fiduciaries' assertion that the district court's analysis was based "entirely" upon its erroneous interpretation of the IPS is incorrect.

-11-

Firestone, 489 U.S. at 111 ("Trust principles make a deferential standard of review appropriate when a trustee exercises discretionary powers."); Cox v. Mid-America Dairymen, Inc., 965 F.2d 569, 572 (8th Cir. 1992) ("Trust law plainly does not permit a reviewing court to reject a discretionary trustee decision with which the court simply disagrees.").

"ERISA represents a 'careful balancing between ensuring fair and prompt enforcement of rights under a plan and the encouragement of the creation of such plans.'" Conkright, 559 U.S. at 517 (quoting Aetna Health Inc. v. Davila, 542 U.S. 200, 215 (2004)). Preserving that balance "by permitting an employer to grant primary interpretive authority over an ERISA plan to the plan administrator," Firestone deference (1) encourages employers to offer ERISA plans by controlling administrative costs and litigation expenses; (2) creates administrative efficiency; (3) "promotes predictability, as an employer can rely on the expertise of the plan administrator rather than worry about unexpected and inaccurate plan interpretations that might result from de novo judicial review"; and (4) "serves the interest of uniformity, helping to avoid a patchwork of different interpretations of a plan." Id.

Like most circuits to address the issue, we see no compelling reason to limit Firestone deference to benefit claims.[6] "'Where discretion is conferred upon the

_____

[6]Other circuits have agreed. Cf., e.g., Tibble v. Edison Int'l, 729 F.3d 1110, 1130 (9th Cir. 2013) (explaining that "[n]ot applying Firestone deference . . . would risk" creating conflicting interpretations of the same plan under § 1132(a)(1)(B) and § 1104(a)(1)(D)); Armstrong v. LaSalle Bank Nat'l Ass'n, 446 F.3d 728, 733 (7th Cir. 2006) ("Even if . . . the general standard of review of an [employee stock ownership plan fiduciary]'s decisions for prudence is plenary, a decision that involves a balancing of competing interests under conditions of uncertainty requires an exercise of discretion, and the standard of judicial review of discretionary judgments is abuse of discretion."); Hunter v. Caliber Sys., Inc., 220 F.3d 702, 711 (6th Cir. 2000) (finding "no barrier" to applying a deferential standard to a case "not involving a typical review of denial of benefits"); Moench v. Robertson, 62 F.3d 553, 565 (3d Cir.

-12-

trustee with respect to the exercise of a power, its exercise is not subject to control by the court except to prevent an abuse by the trustee of his discretion.'" <u>Firestone</u>, 489 U.S. at 111 (quoting <u>Restatement (Second) of Trusts</u> § 187 (1959) (alterations omitted)). "This deferential standard reflects our general hesitancy to interfere with the administration of a benefits plan." <u>Layes v. Mead Corp.</u>, 132 F.3d 1246, 1250 (8th Cir. 1998). Given the grant of discretion in this case, the district court should have reviewed the Plan administrator's determinations under the Plan for abuse of discretion. With that in mind, we now turn to the ABB fiduciaries' substantive challenges to the district court's judgment.

### B. Recordkeeping

"ERISA imposes upon fiduciaries twin duties of loyalty and prudence, requiring them to act 'solely in the interest of [plan] participants and beneficiaries' and to carry out their duties 'with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.'" <u>Braden v. Wal-Mart Stores, Inc.</u>, 588 F.3d 585, 595 (8th Cir. 2009) (alteration in original) (quoting 29 U.S.C. § 1104(a)(1)). "Section [1104]'s prudent person standard is an objective standard that focuses on the fiduciary's conduct preceding the challenged decision"—not the results of that decision. <u>Roth v. Sawyer-Cleator Lumber Co.</u>, 16 F.3d 915, 917-18 (8th Cir. 1994) (internal citation omitted). "Even if a trustee failed to conduct an investigation before making a decision, he is insulated

---

1995) ("[W]e believe that after <u>Firestone</u>, trust law should guide the standard of review over claims, such as those [arising from an employee stock ownership plan], not only under section 1132(a)(1)(B) but also over claims filed pursuant to 29 U.S.C. § 1132(a)(2) based on violations of the fiduciary duties set forth in section 1104(a)."). <u>But</u> <u>see</u> <u>John Blair Commc'ns, Inc. Profit Sharing Plan v. Telemundo Grp., Inc. Profit Sharing Plan</u>, 26 F.3d 360, 369 (2d Cir. 1994) (declining to apply the arbitrary and capricious standard beyond the "simple denial of benefits").

-13-

from liability if a hypothetical prudent fiduciary would have made the same decision anyway."  Id. at 919.

### 1. Range of Investment Options

The ABB fiduciaries contend the fact the Plan offered a wide "range of investment options from which participants could select low-priced funds bars the claim of unreasonable recordkeeping fees."  In support, the ABB fiduciaries rely on Hecker v. Deere & Co. (Hecker I), 556 F.3d 575, 586 (7th Cir. 2009), Loomis v. Exelon Corp., 658 F.3d 667 (7th Cir. 2011), and Renfro v. Unisys Corp., 671 F.3d 314, 327 (3d Cir. 2011), which the ABB fiduciaries propose "collectively hold that plan fiduciaries cannot be liable for excessive fees where, as here, participants in a self-directed 401(k) retirement savings plan that offers many different investment options with a broad array of fees can direct their contributions across different cost options as they see fit."

The ABB fiduciaries' reliance on Hecker I and its progeny is misplaced.  Such cases are inevitably fact intensive, and the courts in the cited cases carefully limited their decisions to the facts presented. See Hecker v. Deere & Co., 569 F.3d 708, 711 (7th Cir. 2009) (explaining "the opinion was tethered closely to the facts"); Loomis, 658 F.3d at 671; Renfro, 671 F.3d at 327 (deciding "the range of investment options . . . [is a] highly relevant fact[] . . . against which the plausibility of claims . . . should be measured").  The facts of this case, unlike the cited cases, involve significant allegations of wrongdoing, including allegations that ABB used revenue sharing to benefit ABB and Fidelity at the Plan's expense.  See, e.g., Loomis, 658 F.3d at 671 (noting there was "no reason to think [the defendant] chose these funds to enrich itself at participants' expense"). Such allegations of wrongdoing with respect to fees state a claim for fiduciary breach.  See Braden, 588 F.3d at 590, 598.

-14-

## 2.  Breach

The ABB fiduciaries claim the district court erred in concluding they breached their fiduciary duties by failing to monitor and control recordkeeping fees and for paying excessive revenue sharing from Plan assets to subsidize ABB's other corporate services.  According to the ABB fiduciaries, the district court erroneously (1) "implied that certain business arrangements, such as bundling of investment management and recordkeeping services through a single provider," were automatically improper, (2) failed to give proper weight to the recognized benefits of revenue sharing, and (3) "relied on unwarranted inferences" in finding ABB and the EBC favored ABB's and Fidelity's interests at the Plan's expense.  We disagree.

The district court did not condemn bundling services or revenue sharing, which are common and "acceptable" investment industry practices that frequently inure to the benefit of ERISA plans.  Rather, the district court found the ABB fiduciaries breached their duties to the Plan by failing diligently to investigate Fidelity and monitor Plan recordkeeping costs based on the ABB fiduciaries' specific failings in this case.  The district court found, as a matter of fact, that the ABB fiduciaries failed to (1) calculate the amount the Plan was paying Fidelity for recordkeeping through revenue sharing, (2) determine whether Fidelity's pricing was competitive, (3) adequately leverage the Plan's size to reduce fees, and (4) "make a good faith effort to prevent the subsidization of administration costs of ABB corporate services" with Plan assets, even after ABB's own outside consultant notified ABB the Plan was overpaying for recordkeeping and might be subsidizing ABB's other corporate services.

The district court's factual findings find ample support in the record, and its legal conclusion that the ABB fiduciaries breached their fiduciary duties to the Plan was not in error.  Any failure by the district court to afford discretion to the Plan administrator's interpretation of the Plan with respect to recordkeeping and revenue sharing was harmless under the circumstances.  <u>See</u> Fed. R. Civ. P. 61 (explaining

-15-

"the court must disregard all errors and defects that do not affect any party's substantial rights").

### 3. Damages

The ABB fiduciaries maintain there is no basis for the district court's award of $13.4 million in excessive recordkeeping fees because the award rested on the unreliable testimony of the participants' expert, Al Otto. According to the ABB fiduciaries, the district court abused its discretion by (1) failing to rule on Otto's reliability; (2) rejecting the ABB fiduciaries' Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), challenge; (3) admitting Otto's testimony; and (4) relying on that testimony in awarding damages resulting from excessive recordkeeping fees. See Eckelkamp v. Beste, 315 F.3d 863, 869 (8th Cir. 2002) (standard of review). These arguments are unavailing.

In a bench trial, we not only give the trial court "'wide latitude in determining whether an expert's testimony is reliable,'" Khoury v. Philips Med. Sys., 614 F.3d 888, 892 (8th Cir. 2010) (quoting Fireman's Fund Ins. Co. v. Canon U.S.A., Inc., 394 F.3d 1054, 1057 (8th Cir. 2005)), we also "relax Daubert's application," David E. Watson, P.C. v. United States, 668 F.3d 1008, 1015 (8th Cir. 2012). Contrary to the ABB fiduciaries' assertion that the district court failed to rule on Otto's reliability, the district court denied the Daubert challenge before trial, stating the Daubert issues in the case were "matters for the court to consider in terms of weighing the evidence [in this bench trial] as opposed to finding that the evidence is so unreliable that it should not even be considered." The district court's reliability ruling is inherent in that determination, and the district court's rejection of the ABB fiduciaries' challenge was well within its discretion.

The ABB fiduciaries also had a full opportunity to test Otto and his methodology on cross-examination, which they did. See id. ("Generally, 'the factual basis of an expert opinion goes to the credibility of the testimony, not the

-16-

admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.'" (quoting Neb. Plastics, Inc. v. Holland Colors Ams., Inc., 408 F.3d 410, 416 (8th Cir. 2005))). The district court did not abuse its discretion in awarding damages based on Otto's testimony.

### C. Selection of Plan Investment Options and Mapping
#### 1. Timeliness

Absent fraud or concealment not present here, 29 U.S.C. § 1113(1)(A) requires a plaintiff to bring fiduciary breach claims within "six years after . . . the date of the last action which constituted a part of the breach or violation." The participants filed suit December 29, 2006. The ABB fiduciaries argue the participants' claim based on the mapping of funds from the Wellington Fund to the Freedom Funds is time barred. As the ABB fiduciaries see it, the last date of the action that constituted the breach was in November 2000, when PRC decided to remove the Wellington Fund and add the Freedom Funds. We are unconvinced.

The last fiduciary acts constituting the alleged breach—amending the trust agreements, removing the Wellington Fund as an investment option, selecting the Freedom Funds, and mapping Plan assets to the Freedom Funds—all took place during or after March 2001, bringing them within the six-year statute of limitation. The district court correctly determined the participants' mapping claim was timely.

#### 2. Breach

In determining the ABB fiduciaries breached their fiduciary duties with respect to selecting investment options and mapping from the Wellington Fund to the Freedom Funds, the district court relied heavily on its interpretation of the Plan and the provisions of the IPS. The ABB fiduciaries challenge the district court's factual findings, methodology, and conclusions. Although the ABB fiduciaries maintain the

-17-

IPS is not a Plan document, they assert that even if it is, neither the IPS nor ERISA required the investment selection and removal process the district court required.

According to the ABB fiduciaries, the district court erroneously substituted its own de novo interpretation of the Plan and view of the ideal Plan investments for the reasoned judgment of "those bodies legally charged with the actual exercise of discretion." The ABB fiduciaries also contend the district court's analysis reflects an improper hindsight bias as demonstrated by the district court "reason[ing] *ex post* that 'between 2000 and 2008, the Wellington Fund[] outperformed the Freedom Funds.'" (quoting the district court opinion). See Roth, 16 F.3d at 918 ("[T]he prudent person standard is not concerned with results; rather, it is a test of how the fiduciary acted viewed from the perspective of the time of the challenged decision rather than from the vantage point of hindsight." (internal marks omitted) (quoting Katsaros v. Cody, 744 F.2d 270, 279 (2d Cir. 1984))).

The ABB fiduciaries' points are well taken. The district court's opinion shows clear signs of hindsight influence regarding the market for target-date funds at the time of the redesign and the investment options' subsequent performance. While it is easy to pick an investment option in retrospect (buy Apple Inc. at $7 a share in December 2000 and short Enron Corp. at $90 a share), selecting an investment beforehand is difficult. The Plan administrator deserves discretion to the extent its *ex ante* investment choices were reasonable given what it knew at the time. It is also not manifest the district court afforded any deference to the ABB Plan administrator's determinations under the Plan documents. "As the more deferential discretionary standard of review could have affected any facet of the district court's analysis, we are far from certain the district court would have arrived at the same conclusions" had it applied the required deferential standard of review in evaluating whether the ABB fiduciaries, at the time they made their investment decisions, breached their fiduciary duties in implementing the redesign and evaluating and selecting Plan investment

-18-

options in accordance with the Plan.  Jobe v. Med. Life Ins. Co., 598 F.3d 478, 486 (8th Cir. 2010); accord Wallace v. Firestone Tire & Rubber Co., 882 F.2d 1327, 1330 (8th Cir. 1989) (explaining that when an improper standard of review is "interwoven into almost all of the court's factual findings, we cannot be sure it would have made the same factual conclusions if it had employed the required . . . standard of review"). As such, we vacate the district court's judgment and award on this claim and remand for further consideration.

### 3.     Damages

On remand, the district court should reevaluate its method of calculating the damage award, if any, for the participants' investment selection and mapping claims.[7] See Peabody v. Davis, 636 F.3d 368, 373 (7th Cir. 2011) (clarifying in an ERISA case that "[t]he method of calculating damages is reviewed de novo; the calculations pursuant to the method are reviewed for clear error").  First, the district court awarded the amount that participants who had invested in the Wellington Fund presumably would have had if (1) ABB had not replaced the Wellington Fund with the Freedom Funds, and (2) the participants remained invested in the Wellington Fund for the entire period at issue.  In light of the IPS requirement to add a managed allocation fund, it seems the participants' mapping damages, if any, would be more accurately measured by comparing the difference between the performance of the Freedom Funds and the minimum return of the subset of managed allocation funds the ABB fiduciaries could have chosen without breaching their fiduciary obligations.

Second, the district court determined "it [was] a reasonable inference that participants who invested in the Freedom Funds would have invested in the Wellington Fund had it not been removed from the Plan's investment platform."  Such an inference appears to ignore the investment provisions of the IPS, participant choice

----

[7]We address this issue because it may "arise again on remand."  Halbach v. Great-West Life & Annuity Ins. Co., 561 F.3d 872, 882 (8th Cir. 2009).

Appellate Case: 12-2060     Page: 19     Date Filed: 03/19/2014 Entry ID: 4135149

under the Plan, and the popularity of managed allocation funds.  And the participants fail to cite any evidentiary support for inferring the participants' voluntary, post-mapping investments in the Freedom Funds would have instead been made in the Wellington Fund, even if that fund remained as a Plan option for all of the years at issue.  "A reasonable inference is one 'which may be drawn from the evidence without resort to speculation.'"  <u>Sip-Top, Inc. v. Ekco Grp., Inc.</u>, 86 F.3d 827, 830 (8th Cir. 1996) (quoting <u>Hauser v. Equifax, Inc.</u>, 602 F.2d 811, 814 (8th Cir. 1979)).  As calculated, the $21.8 million damage award for the participants' mapping claim is speculative and exceeds the "losses to the plan resulting from" any fiduciary breach. 29 U.S.C. § 1109.

### D.    Float

Fidelity appeals the district court's conclusion that Fidelity breached its fiduciary duties of loyalty by failing to pay float income to the Plan.[8]  Fidelity asserts "Fidelity was not required to credit the Plan with income earned on overnight investments of float" because "[f]loat was not a Plan asset" within the meaning of ERISA and "Fidelity was paid nothing for the float"—"no fees" and "none of the float earnings."  Fidelity maintains that, as a matter of basic property rights, the investment options—not the Plan—owned the float and bore the risk of loss with respect to the float accounts and thus were entitled to any benefits of ownership. Fidelity's appeal to basic property rights is persuasive on this record.

Although "ERISA does not exhaustively define the term 'plan assets,' . . . [t]he Secretary of Labor has repeatedly defined 'plan assets' consistently with ordinary notions of property rights."  <u>Kalda v. Sioux Valley Physician Partners, Inc.</u>, 481 F.3d 639, 647 (8th Cir. 2007) (quotation omitted).  Here, the participants failed to adduce any evidence the Plan had any property rights in the float or float income.  To the

---

[8]Fidelity asserts the participants' float claims are barred by 29 U.S.C. § 1113(1). For the purpose of this appeal, we assume the participants' float claims are timely.

-20-

contrary, the record evidence indicates that when a contribution was made, Fidelity credited the participant's Plan account and the Plan became the owner of the shares of the selected investment option—typically shares of a mutual fund—the same day the contribution was received. The Plan received the full benefit of ownership—including any capital gains or dividends from the purchased shares—as of the purchase date.

The participants do not rebut Fidelity's simple assertion that "[o]nce the Plan became the owner of the shares, it was no longer also owner of the money used to purchase them," which flowed to the investment options through the depository account held for their benefit. Under the evidence and circumstances of this case, the Plan investment options held the property rights in the depository float and were entitled to the float income. Fidelity did not breach any fiduciary duties with respect to the depository account.

The participants also fail to establish the Plan had any rights in the redemption account balance, which, like the depository account, was registered for the benefit of the investment options.[9] Fidelity proposes, "As a matter of black-letter commercial law, the payee of an uncashed check has no title in or right to interest on the account funds." See U.C.C. § 3-112(a)(i) (explaining "an instrument is not payable with interest" "[u]nless otherwise provided in the instrument"). According to Fidelity, when a participant chose to receive a check rather than an electronic disbursement, the relevant Plan investment options retained all rights to the redemption float until the disbursement check was cashed.

---

[9]The parties do not make any distinction between the redemption account and the disbursement account, which is also registered for the benefit of the investment options. We follow that practice.

-21-

Appellate Case: 12-2060     Page: 21     Date Filed: 03/19/2014 Entry ID: 4135149

The participants agree with Fidelity that "the funder of the check owns the funds in the checking account until the check is presented, and thus is entitled to any interest earned on that float," but the participants contest the ownership of the funds at issue. The participants assert, "In this case, the owner is the *Plan*[]," making the float income a Plan asset. But the participants do not cite any record evidence establishing the Plan as "the funder of the check" or the owner of the funds in the redemption account. Absent proof of any ownership rights to the funds in the redemption account, the Plan had no right to float income from that account.

Because the participants have failed to show the float was a Plan asset under the circumstances of this case, the district court erred in finding Fidelity breached its fiduciary duty of loyalty by paying the expenses on the float accounts and distributing the remaining float to the investment options.

### E. Attorney Fees

Under 29 U.S.C. § 1132(g)(1), "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." The district court awarded $12,947,747.68 in attorney fees and $489,985.00 in costs jointly and severally against the ABB fiduciaries and Fidelity. The ABB fiduciaries and Fidelity both challenge the award, but for different reasons. The ABB fiduciaries argue the district court erred in (1) using a national rate in calculating the award because experienced local counsel handled the case, and (2) applying a blended rate of $514.60 per hour when the award included substantial time for twelve lawyers who never entered an appearance and performed uncomplicated work, including document review, deposition summaries, and database management. Fidelity challenges the decision to make liability for the award joint and several.

Although the hourly rate the district court applied for attorney work is generous and the resulting fee award substantial, we are unable to say the district court abused

-22-

its discretion in determining the rate to use in calculating the award. <u>See</u> <u>Geissal ex</u> <u>rel. Estate of Geissal v. Moore Med. Corp.</u>, 338 F.3d 926, 935 (8th Cir. 2003) (standard of review). Nonetheless, we vacate the award for further consideration in light of our decision to vacate the mapping award and because we reverse the judgment against Fidelity, which can no longer be liable for attorney fees and costs. We leave for the district court to determine the amount by which the attorney fee award against the ABB fiduciaries should be reduced after resolving the remaining issues on remand. In recalculating any award, the district court should be careful to apply the generous attorney rate it has allowed in this case only to work that requires an attorney—not administrative, clerical, or paralegal work.

## III. CONCLUSION

We affirm the district court's judgment and award against the ABB fiduciaries with respect to recordkeeping, but vacate the judgment and award on the participants' investment selection and mapping claims. We reverse the district court's judgment against Fidelity, vacate the attorney fee award as to all defendants, and remand for further proceedings consistent with this opinion.

BYE, Circuit Judge, dissenting in part.

Unlike the majority, I would conclude float is a Plan asset under these circumstances and Fidelity therefore breached its fiduciary duty of loyalty by transferring float to the Depository Account for the benefit of investment options and by using float income to pay for bank expenses.

In concluding float is not a Plan asset, the majority has been persuaded by principles of property law. However, I find basic principles of property law are not persuasive in light of regulations which specifically define Plan assets in the context

Appellate Case: 12-2060    Page: 23    Date Filed: 03/19/2014 Entry ID: 4135149

of ERISA. Regarding the definition of Plan assets, the Department of Labor regulations implementing ERISA provide:

> [T]he assets of the plan include amounts (other than union dues) that a participant or beneficiary pays to an employer, or amounts that a participant has withheld from his wages by an employer, for contribution or repayment of a participant loan to the plan, *as of the earliest date on which such contributions or repayments can reasonably be segregated* from the employer's general assets.

29 C.F.R. § 2510.3-102(a)(1) (2012) (emphasis added). I read this regulation to mean that a distribution to the Plan is a Plan asset at the time it is placed into Fidelity's depository account, thus making depository float a Plan asset. Additional Department of Labor Resources convince me redemption float is also a Plan asset. U.S. Dep't of Labor, Information Letter (1994), *available at* http://www.dol.gov/ebsa/regs/ILs/il081194.html (stating self-dealing is improper with respect to retaining earnings on float attributable to outstanding checks). Because the funds in Fidelity's float accounts were Plan assets, the float income, consisting of interest earned from Plan assets and returns from investing of Plan assets, is also considered to be a Plan asset.

I would also find Fidelity breached its fiduciary duty of loyalty in handling the float as well as the float income. The Department of Labor expects that parties should, "as part of their fee negotiations, provide full and fair disclosure regarding the use of float[.]" U.S. Dep't of Labor, Field Assistance Bulletin 2002-3 (2002), *available at* http://www.dol.gov/ebsa/regs/fab2002-3.html. As such, if Fidelity had "openly negotiated" to retain float income "as part of its overall compensation," a breach of fiduciary duties by Fidelity would not be before this court. Id. However, Fidelity failed to negotiate float openly and thus Fidelity was improperly using, for its own benefit, float income which was property of the Plan. See George v. Kraft Foods Global, Inc., 641 F.3d 786, 801 (7th Cir. 2011) ("Under State Street's

-24-

agreement with the Plan, State Street was allowed to retain the income earned from float. Absent this agreement, any float income would have been property of the Plan.").

Accordingly, I respectfully dissent from the majority's conclusion that the district court erred in assessing damages for Fidelity's handling of float and income generated from such float.

_____

-25-